# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Roberto Lewis Rodea,

                Petitioner,           Case No. 19-cv-10184

v.

                                   Judith E. Levy

Mark McCullick,               United States District Judge

                Respondent.

_____/

# OPINION AND ORDER
# DENYING THE HABEAS CORPUS PETITION,
# DENYING A CERTIFICATE OF APPEALABILITY,
# AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Petitioner Roberto Lewis Rodea filed a *pro se* petition for the writ of habeas corpus under 28 U.S.C. § 2254. *See* Pet. (ECF No. 1.) He challenges his state convictions for first-degree murder, conspiracy to commit first-degree murder, and several weapon offenses. He alleges that (1) there was insufficient evidence to sustain the jury's verdict, (2) a juror tainted the verdict, lied during *voir dire*, and disobeyed jury instructions, (3) the prosecutor engaged in misconduct, (4) the trial court abused its discretion by denying his motion for severance, and (5) he was denied effective assistance of trial and appellate counsel. *See* Pet. (ECF No. 1,

PageID.22–25). Respondent Mark McCullick urges the Court to deny the petition because Petitioner's claims are procedurally defaulted, lack merit, or were reasonably decided by the state court. *See* Answer in Opp'n to Pet. at i–iii (ECF No. 11, PageID.1231–1233).

For the reasons set forth below, Petitioner's claims for habeas relief are denied. The Court also declines to issue a certificate of appealability. The Court grants Petitioner permission to appeal *in forma pauperis* ("IFP") because he was granted permission to proceed IFP in this Court, and an appeal from the Court's decision could be taken in good faith.

## I.  BACKGROUND

### A. The Charges, Trial, and Sentence

Petitioner was charged in Saginaw County, Michigan with the following crimes: first-degree, premeditated murder, Mich. Comp. Laws § 750.316(1)(a); conspiracy to commit first-degree, premeditated murder, Mich. Comp. Laws §§ 750.157a and 750.316(1)(a); two counts of intentionally discharging a firearm at a dwelling or occupied structure, Mich. Comp. Laws § 750.234b; carrying a dangerous weapon with unlawful intent, Mich. Comp. Laws § 750.226; felon in possession of a

2

firearm, Mich. Comp. Laws § 750.224f; and six counts of possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. *See* 1/4/12 Trial Tr. at 17–18 (ECF No. 10-6, PageID.418). The charges arose from shootings outside of two bars in the city of Saginaw, Michigan on Friday, February 18, 2011, or early Saturday, February 19, 2011.

Petitioner was tried jointly with his co-defendant, Steven Rembish, in Saginaw County Circuit Court. The Michigan Court of Appeals accurately summarized the evidence at trial as follows:

> [A] number of witnesses testified that defendants Rembish and Rodea were involved in a fight at the Corner Lounge after they and others went to the location to celebrate a birthday. After the fight, the two were ejected from the bar. Witnesses heard Rodea stating that he had lost some cocaine, and the witnesses testified that both he and Rembish threatened to return and "shoot up" or "spray" the bar. The two drove away in Rembish's car—a light blue 1986 Oldsmobile Calais—that Sean (sic) Rembish had purchased a week before. Witnesses then testified that, between 15 and 40 minutes after the fight ended, the Corner Lounge was struck by multiple bullets. Between 8 and 14 individuals were inside at the time, including Dawn Ricklefs. She was struck by two of the bullets, in the chest and in the shoulder, and died as a result of her injuries. Another patron was grazed in the head. A witness stated that, after the shooting, he went outside where he saw a car drive away from the bar with its headlights turned off.

3

The car's taillights matched that of the photographs of Rembish's car. Still other witnesses testified that other shots were fired at approximately 1:15 a.m. at the Maple Gardens Bar, which was located near the Corner Lounge.

Sean Berg testified that he had a conversation with Rembish on Saturday, February 19, 2011. Rembish told Berg that he had just taken his car to "the farm" because he knew the police were looking for it. Rembish also told Berg that he had taken his gun out to the swamp and disposed of it.[1] Rembish told him that he planned to wait for the police to arrive and asked Berg to take care of Rembish's family. At approximately the same time, Berg received a call from Rodea, who told him that Rodea had "messed up," asked Berg to take care of Rodea's children, and stated that he was probably going away for the rest of his life. Rodea told Berg about the fight, that he had lost some cocaine at the bar, and that Rodea was "mad" and wanted to go back and get into a fight.

Rembish's girlfriend (Danielle Kuebler) testified that, prior to the shooting, Rembish had hidden a handgun, later matched to the type used in the shooting, in the fireplace of their home. Kuebler stated that at approximately 12:00 a.m., Rembish woke her up when he returned to the home. He came to the bedroom but, because she was mad at him for staying out late, she told him to leave. She then heard the fireplace open. She thought that Rembish remained out in the living room, but admitted that she did not know where Rembish was for

---

[1] Rembish's car was later located at the farm by police. [The trial transcript states that "the farm" referenced belongs to Rembish's uncle. 1/11/12 Trial Tr. at 105 (ECF No. 12-1, PageID.1346).]

4

approximately an hour to an hour and a half, when he eventually returned to the bedroom. Danielle Kuebler also testified that, after the police had begun questioning others, she witnessed Rembish smash his cell phone in the driveway. He later wrote her a letter apologizing for putting her through stress, which she took to mean the stress of having her home searched. She was also questioned concerning whether Rembish had admitted that he had been involved in the shootings, and she stated that Rembish's story kept changing, but that he admitted involvement in the fight.

Detective Fink testified that he had analyzed the phone records of Berg, Rodea, and Rembish. Among the evidence presented was the finding that calls were made from Rembish and Rodea's phones in the vicinity of the Maple Gardens bar shortly after the 911 call reporting the shooting was placed. In addition to the phone evidence, witness testimony tied Rembish to a handgun model previously in his possession that had a very high probability of being the same model used in the shooting. Testimony placed the same car model as Rembish's at the scene of the Corner Lounge shooting.

*People v. Rodea*, No. 308935, 2015 WL 122703, at *9–*10 (Mich. Ct. App. Jan. 8, 2015) (unpublished) (footnote in original as note 4).

Petitioner testified in his own defense and did not produce any other witnesses. He admitted to being present at the Corner Lounge during the fight and looking for his cocaine after the fight. But he claimed that he, Rembish, Joshua Kollman, and David Nietzelt left the bar after

the fight and that he spent the rest of the night at Rembish's home because he was sick. *See* 1/11/12 Trial Tr. at 47–58 (ECF No. 12-1, PageID.1332–1334) ("I got a little sick. I was throwing up from the drinks.").

Regarding his alleged threat to return and shoot up the Corner Lounge, Petitioner testified that he did not remember the exact words he used at the time. He said that he was angry and that "people say things they don't mean when they're drunk and angry." *Id.* at 61–62, 70–72 (*Id.* at PageID.1335, 1337–1338).

On cross-examination, Petitioner denied being involved in the shooting at the Corner Lounge. *Id.* at 64–65 (*Id.* at PageID.1336). Although he testified that Kollman was driving Rembish's car that night, he admitted that after he, Rembish, Kollman, and Nietzelt got to Rembish's house in Rembish's car, Kollman and Nietzelt walked away. *Id.* at 67–69, 73, 77–78 (*Id.* at PageID.1337–1339). Petitioner said that he may have used his phone that night, but that he noticed he had missed calls while he was at Rembish's house, "trying to sleep it off" and "throwing up." *Id.* at 77, 79–81 (*Id.* at PageID.1340).

6

Rembish did not testify or present any witnesses. His defense was that there was no physical evidence, such as a weapon, DNA, fingerprints, or gunshot residue, linking him to the shooting, and that nobody was claiming he was the shooter. *Id*. at 130–32 (*Id*. at PageID.1352–1353). Rembish's attorney conceded that Rembish's car was involved in the shooting. *Id*. at 140 (*Id*. at PageID.1355) ("[T]here's no question it's his car."). But, he argued, someone else could have been driving the car. *Id*. at 141 (*Id*. at PageID.1355) ("Just because you own a car doesn't mean you're driving the vehicle."). He also argued that Sean Berg was not a credible witness because he was granted immunity for his testimony. *Id*. at 141–44 (*Id*. at PageID.1355–1356). The prosecutor argued that Petitioner was with Rembish throughout the late night and early morning when the shooting occurred, and cell phone tower evidence and other evidence (including eyewitnesses) linked both men to the scene of the crime. *Id*. at 166–170 (*Id*. at PageID.1361–1362.)

The trial court instructed the jury on second-degree murder as a lesser-included charge of first-degree murder, but the jury found Petitioner guilty, as charged, of first-degree murder and the other eleven

counts against him. *See* 1/12/12 Trial Tr. at 7–12 (ECF No. 12-2, PageID.1407–1412). On February 16, 2012, the trial court sentenced Petitioner to two years in prison for the felony-firearm convictions, with 349 days credit. *See* 2/16/12 Sentencing Tr. at 11 (ECF No. 12-2, PageID.1425). The court ordered that sentence to be served first and consecutively to the other sentences, which were: life imprisonment for the murder and conspiracy convictions; five to fifteen years in prison for the two counts of discharging a firearm; and seventy-six months (six years, four months) to ten years for carrying a dangerous weapon and being a felon in possession of a firearm.[2] *Id.* at 11–12 (*Id.* at PageID.1425–1426).

### B. The Direct Appeal

On appeal from his convictions, Petitioner argued through counsel that there was insufficient evidence of premeditated murder and the firearm charges because there was no direct evidence that he was present

---

[2] The trial court judge appears to have misspoken when it stated that count eleven was a count of carrying a weapon with unlawful intent. *See* 2/16/12 Sentencing Tr. at 12 (ECF No. 12-2, PageID.1426). Count eleven charged Petitioner with being a felon in possession of a firearm. *See* 1/4/12 Trial Tr. at 18 (ECF No. 10-6, PageID.418); 1/12/12 Trial Tr. at 9 (ECF No. 12-2, PageID.1409).

during the shootings and there was no physical evidence tying him to the shootings. *See* Defendant/Appellant's Brief on Appeal (ECF No. 10-10, PageID.768, 795, 797–98). In a *pro se* brief, Petitioner also argued that: (1) his right to a fair and impartial jury was violated when a juror expressed her personal opinion about the case, lied during *voir dire,* and possibly tainted the jury; (2) the prosecutor committed multiple instances of misconduct; (3) trial counsel's cumulative errors deprived him of effective assistance; and (4) the trial court abused its discretion when it denied his motion for severance. The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See Rodea*, 2015 WL 122703, at *1, *9 -*15.

Petitioner moved for a re-hearing or reconsideration on the ground that appellate counsel had not raised four sub-issues regarding the sufficiency of the evidence. *See* Mot. for Rehearing/Reconsideration (ECF No. 12-3). The Court of Appeals denied reconsideration without discussing the issue. *See People v. Rodea*, No. 308935 (Mich. Ct. App. Feb. 23, 2015); (ECF No. 12-4).

9

Petitioner applied for leave to appeal in the Michigan Supreme Court where he raised the four issues that he had presented to the Michigan Court of Appeals. These four issues set forth in his brief are the following: (1) that there was insufficient evidence to convict Petitioner; (2) that a juror engaged in misconduct and was tainted; (3) that the prosecutor engaged in misconduct; and (4) that the trial court should have granted Petitioner's motion for severance. *See* Pro Per Application for Leave to Appeal and Appellant's Additional Issue (ECF No. 10-11, PageID.882–893, 895–96). He also raised a new claim that he was denied effective assistance of appellate counsel. *Id*. The Michigan Supreme Court denied Petitioner's application because the court was not persuaded to review the questions presented to it. *See People v. Rodea*, 498 Mich. 905 (2015).

### C. State Collateral Review

Petitioner filed a post-conviction motion in which he argued that he was denied effective assistance of trial and appellate counsel. *See* Mot. for Relief from J. (ECF No. 10-14). The trial court denied the motion because Petitioner could have raised, or previously raised, his issues on

10

appeal, and Petitioner's claim about appellate counsel lacked merit. *See People v. Rodea*, No. 11-035678-FC, Order and Op. (Saginaw Cty. Cir. Ct. Jan. 13, 2017); (ECF No. 10-12, PageID.1114–1116).

Petitioner appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal because Petitioner failed to establish that the trial court erred when it denied his motion. *See People v. Rodea*, No. 339218 (Mich. Ct. App. Dec. 8, 2017); (ECF No. 10-12, PageID.1058). The Michigan Supreme Court denied leave to appeal because Petitioner had failed to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Rodea*, 502 Mich. 938 (2018).

### D. The Habeas Petition, Answer, and Reply

Petitioner filed his habeas corpus petition in 2019. His grounds for relief, as set forth in his supporting brief, allege: (1) his due process rights were violated because the prosecution failed to present sufficient evidence; (2) a juror tainted the verdict with extraneous influences, her personal opinions, and information not presented at trial; (3) the prosecutor engaged in misconduct; (4) the trial court abused its discretion

by denying his motion to sever his case from his co-defendant's case; and (5) appellate counsel was ineffective. *See* Mem. of Law in Support of Pet. at 1-4 (ECF No. 1, PageID.22–25).

Respondent argues that Petitioner's insufficient-evidence claim is procedurally defaulted and lacks merit; the state court did not unreasonably deny relief on Petitioner's allegation of juror bias; Petitioner's prosecutorial-misconduct claims are procedurally defaulted and meritless; the state court's denial of relief on Petitioner's severance claim was not an unreasonable application of Supreme Court precedent; and most of Petitioner's ineffective-assistance-of-counsel claims are procedurally defaulted and meritless. *See* Answer in Opp'n to Pet. at i-iii (ECF No. 11, PageID.1231–1233). Petitioner states in a reply that he was denied a fair trial and that Respondent made factual errors in his answer. *See* Reply to Respondent's Answer (ECF No. 13).

## II.   STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires prisoners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision'

(1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt[.]' " *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal and end citations omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Only an 'objectively unreasonable' mistake, . . . one 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement,' slips through the needle's eye of § 2254." *Saulsberry v. Lee*, 937 F.3d 644, 648 (6th Cir. 2019) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014), and then *Richter*, 562 U.S. at 103). "That's a 'high bar' to

13

relief, which 'is intentionally difficult to meet.' " *Kendrick v. Parris,* 989 F.3d 459, 469 (6th Cir. 2021) (quoting *Woods v. Donald*, 575 U.S. 312, 316 (2015)), *cert. denied*, 142 S. Ct. 483 (2021).

## III.   DISCUSSION

### A. Sufficiency of the Evidence

#### 1. Alleged Procedural Default

Petitioner alleges first that there was insufficient evidence to sustain the jury's verdict. He contends that, because he was intoxicated, he lacked the specific intent to commit first-degree murder. He also alleges that he was only near a firearm, that the verdict was based solely on circumstantial evidence, speculation, and inferences, and that his presence or participation in the shootings was based solely on cellphone data. *See* Pet. (ECF No. 1, PageID.36). Respondent argues that Petitioner's claim is procedurally defaulted because Petitioner did not base his claim on the same theory during the direct appeal to the Michigan Court of Appeals and because he no longer has an available state remedy to exhaust. *See* Answer in Opp'n to Pet. (ECF No. 11, PageID.1249–1253).

14

To properly exhaust state remedies, as required by 28 U.S.C. § 2254(b)(1), a prisoner must fairly present the factual and legal basis for each of his claims to the state court of appeals and to the state supreme court before raising the claims in a federal habeas corpus petition. *Wagner v. Smith*, 581 F.3d 410, 414–15 (6th Cir. 2009). Neither Petitioner, nor his appellate attorney, raised Petitioner's current arguments regarding the sufficiency of the evidence in their appellate briefs before the Michigan Court of Appeals. Instead, Petitioner maintained that he was not present during the shootings and there was no physical evidence tying him to the shootings. *See* Defendant/Appellant's Brief on Appeal at 22–23 (ECF No. 10-10, PageID.794–795).

Petitioner first raised his current arguments in a motion for rehearing or reconsideration before the Michigan Court of Appeals. Although Respondent argues that raising a claim for the first time in a motion for reconsideration does not constitute fair presentation of a claim for exhaustion purposes, the exhaustion rule is not a jurisdictional requirement. *Castille v. Peoples*, 489 U.S. 346, 349 (1989). A procedural

15

default ordinarily is not a jurisdictional matter either, *Johnson v. Lee*, 578 U.S. 605, 610 (2016) (quoting *Trest v. Cain*, 522 U.S. 87, 89 (1997)), and a court may bypass a procedural-default question if the claim can be resolved easily against the habeas petitioner. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). Accordingly, in the interests of efficiency, and because Petitioner's sufficiency-of-the-evidence claim does not warrant habeas relief, the Court proceeds directly to the merits of Petitioner's claim.

### 2. Clearly Established Federal Law

The Supreme Court has held "that the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Following *Winship*, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*

16

*v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The prosecution need not "rule out every hypothesis except that of guilt beyond a reasonable doubt," *id.* at 326, and "[c]ircumstantial evidence may support a conviction." *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006).

The *Jackson* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. To establish first-degree, premeditated murder in Michigan, "the prosecution must prove that the defendant intentionally killed the victim and [that] the act of killing was deliberate and premeditated." *People v. Haywood*, 209 Mich. App. 217, 229 (1995).

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329 (1971) (internal and end footnotes omitted). "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *People v. Oros*, 502 Mich. 229, 242

17

(2018). Premeditation may also "be inferred from all the facts and circumstances surrounding the incident, including the parties' prior relationship, the actions of the accused both before and after the crime, and the circumstances of the killing itself[.]" *Haywood*, 209 Mich. App. at 229 (internal and end citations omitted).

Criminal conspiracy in Michigan "is a mutual understanding or agreement between two or more persons, expressed or implied, to do or accomplish some criminal or unlawful act." *People v. Hamp*, 110 Mich. App. 92, 102 (1981). "To prove a conspiracy to commit murder, it must be established that each of the conspirators have the intent required for murder and, to establish that intent, there must be foreknowledge of that intent." *Id*. at 103.

To prove the remaining charges against Petitioner, the prosecutor had to show that Petitioner possessed or carried a firearm or weapon, either as a principle or as an aider and abettor. The phrase "aiding and abetting":

> describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime. . . .

18

> To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.

*People v. Carines*, 460 Mich. 750, 757–58 (1999) (quoting *People v. Turner*, 213 Mich. App. 558, 568–69 (1995)). "[M]ere presence at the commission of a trespass or other wrongful act does not render a person liable" as a participant in the wrongful act. *Miller v. Sweitzer*, 22 Mich. 391, 394 (1871).

### 3. Application of the Law

#### a.Intoxication, Intent, and Conspiracy

Petitioner contends that he was too intoxicated to form an intent to kill. Two witnesses, however, testified that, after the fight, Petitioner was turning over tables looking for his cocaine. *See* 1/5/12 Trial Tr. at 136–37

19

(ECF No. 10-7, PageID.512) (Miranda Olivarez's testimony); *id*. at 158, (*Id*. at PageID.517) (Estrella Langley's testimony). He accused people of taking his bag, cocaine, or "coke," and he threatened to return to the Corner Lounge and "shoot up" or "spray" the bar with bullets if the drugs were not returned to him. *See id*. at 41, 49, 52 (*Id*. at PageID.488, 490–491) (Lee Harvkey's testimony); *id*. at 136–37 (*Id*. at PageID.512) (Miranda Olivarez' testimony); *id*. at 159 (*Id*. at PageID.518) (Estrella Langley's testimony); *id*. at 186–89 (*Id*. at PageID.524–525) (Robert Hilyard's testimony); *id*. at 199 (*Id*. at PageID.528) (Lee Harvkey's testimony).

Petitioner also warned Olivarez and Langley to leave the bar because he was coming back. *Id*. at 138 (*Id*. at PageID.158–159, PageID.512, 518). Both women took Petitioner's warning seriously and left the bar. *Id*. at 138, 159 (*Id*. at PageID.512, 518). Petitioner's actions and comments indicate that a rational trier of fact could have found that he was not too intoxicated to form an intent to kill and that he premeditated a murder.

20

Rembish, moreover, was heard saying to Petitioner, "If you don't get your stuff back, everybody in this bar is going down, I mean everybody." *Id*. at 86–90, 101–02 (*Id*. at PageID.499–500, 503). The two defendants' comments were evidence of "a specific intent to return and harm people" and of "the agreement necessary to support the conspiracy conviction." *Rodea*, 2015 WL 122703, at *10.

### b. The Car and the Squeaky Fireplace Screen

Petitioner and Rembish left the Corner Lounge in a car that was sold to Rembish about a week earlier. *See* 1/5/12 Trial Tr. at 46–48, 67 (ECF No. 10-7, PageID.489–490, 495); 1/6/12 Trial Tr. at 15-16 (ECF No. 10-8, PageID.562–563). Rembish was driving at the time, 1/6/12 Trial Tr. at 29 (ECF No. 10-8, PageID.566), and a "Hispanic" man got in the vehicle on the passenger side. *Id*. at 35 (*Id*. at PageID.567). At trial, Sean Berg identified a photograph of a car as the car Petitioner was using at the time. *Id*. at 64–65 (*Id*. at PageID.575).

The fight occurred about midnight on Friday, February 18, 2011, going into Saturday, February 19, 2011. Danielle Kuebler heard Rembish come home sometime between midnight and 1:00 a.m. that night. She

21

heard Rembish open the screen to the fireplace where Rembish previously placed a gun that looked like the gun depicted in a photograph that was admitted in evidence. She maintained at trial that Rembish did not leave the house after she heard the fireplace screen open, and that Petitioner spent the night at her and Rembish's home. She admitted, however, that she did not know where Rembish was for about an hour and a half that evening, and she said that she did not see Petitioner at her house until the next day. *Id.* at 177–81, 184–86, 195–96, 210–13 (*Id.* at PageID.603–05, 607–08, 611–12).

### c. Cell Phone Analysis

Detective Timothy Fink's testimony established that Kuebler was trying to reach Rembish by phone at the approximate time of the shootings and that Rembish's phone was near the two bars then. Fink testified that the distance between Rembish and Kuebler's home and the Corner Lounge was 3.6 miles and that it took between eight and nine minutes to travel that distance at midnight. *See* 1/10/12 Trial Tr. at 112–14 (ECF No. 10-9, PageID.671–672). Kuebler's cell phone called Rembish's cell phone at 12:19 a.m. and 12:37 a.m. on February 19, 2011,

22

but the call went unanswered. *Id*. at 148–49 (*Id*. at PageID.680). The 911 call from the Corner Lounge came in shortly afterward, at 12:52 a.m. on February 19, 2011. The next unanswered call from Kuebler's phone to Rembish's phone was at 1:20 a.m. *Id*. at 149 (*Id*. at PageID.680). The 911 call from the Maple Gardens bar was 1:22 a.m. *Id*. at 150 (*Id*. at PageID.681). Cell phone tower evidence indicated that Rembish's phone was near the Maple Gardens bar at the time. *Id*.

Cell phone records also placed Petitioner near the two bars at the time of the shootings, even though he testified that he went to Rembish and Kuebler's home after the fight and remained there for the night. Detective Fink testified that numerous calls were made to and from Petitioner's cell phone between 12:45 a.m. and 2:30 a.m. on February 19, 2011, and that his phone was communicating with a cell phone tower near the Maple Gardens bar at the time. *Id*. at 154 (*Id*. at PageID.680). One call was sent to his phone six minutes before the shooting at the Corner Lounge. *Id*.

Between 1:21 a.m. and 1:22 a.m. that night, Kuebler's phone called Petitioner's phone three times. Petitioner's phone was still

23

communicating with a cellphone tower located near the Maple Gardens Bar at the time, and the 911 call from that bar was placed at 1:22 a.m. *Id*. at 154–55 (*Id*. at PageID.682).

### d. The Defendants' Comments to Sean Berg

While the case was being investigated, Rembish informed Sean Berg that he threw his gun in a swamp and had taken his car to the farm because he knew the police were looking for it. Rembish asked Berg to take care of his family because he was waiting for the police to kick in his door. *See* 1/6/12 Trial Tr. at 59–60, 79 (ECF No. 10-8, PageID.573–574, 578).

Petitioner also spoke with Berg about the incident at the Corner Lounge. Petitioner said that he had lost cocaine at the bar, had "messed up," and wanted Berg to "look[ ] after his family" because he was "probably going away the rest of his life." *Id*. at 65–66, 82, 86 (*Id*. at PageID.575, 579–80).

### e. The Physical Evidence

No weapon was admitted in evidence, but both Petitioner and Rembish stipulated that they previously were convicted of a specified

24

felony and were not eligible to possess a firearm on the date of the shootings and the alleged murder. *See* 1/10/12 Trial Tr. at 6–8 (ECF No. 10-9, PageID.645). An expert witness in firearms testified that several of the bullets submitted to him for analysis were nine-millimeter Lugers or 357 Sig caliber fired bullets, unique to Smith & Wesson Sigma-style pistols and nine-millimeter lugers. *Id.* at 52–54, 96–97 (*Id.* at PageID.656–657, 667). All the casings found outside the two bars were fired from the same pistol. *Id.* at 56–57, 61 (*Id.* at PageID.657–658).

Sean Berg testified that one of the photographs admitted in evidence depicted a weapon like the two-tone, nine-millimeter gun he had seen at Rembish's house. *See* 1/6/12 Trial Tr. at 60–63 (ECF No. 10-8, PageID.574). And the firearms expert testified that the gun pictured in the exhibit could have fired the bullets. *See* 1/10/12 Trial Tr. at 55 (ECF No. 10-9, PageID.657).

Although there was no direct evidence that Petitioner fired the gun that was used during the shootings, the jury could have inferred from all the evidence that Petitioner had joint possession of the firearm. According to the Michigan Court of Appeals, Petitioner's joint possession

25

of the weapon "was sufficient both to support the felony-firearm convictions and his other convictions, at least as an aider and abettor. *Rodea*, 2015 WL 122703, at *10.

### f. Summary

The jury could have inferred from the two defendants' relationship, their comments and actions before and after the crimes, and the multiple shootings that Petitioner premeditated and deliberated a murder and conspired with Rembish to commit the murder. The jury also could have inferred that Petitioner fired at the bars while riding in Petitioner's car and that he was guilty of the weapon offenses, either as a principle or as an aider and abettor. Thus, a rational juror could have concluded from all the evidence taken in the light most favorable to the prosecution that Petitioner committed the charged crimes. He is not entitled to relief on his challenge to the sufficiency of the evidence.

### B.   Juror Amanda Hill

Petitioner's second claim alleges that juror Amanda Hill tainted the verdict with extraneous influences by discussing his case with members of the public before deliberations began and by providing the other jurors

26

with personal opinions and information not presented at trial. Petitioner also asserts that Hill lied during the *voir dire* proceeding and disobeyed the trial court's jury instructions. *See* Mem. in Support of Pet. at 24–27 (ECF No. 1, PageID.45–48).

Petitioner has not supported his argument with any proofs, but in his *pro se* state appellate brief he claimed that after his trial, two members of the public contacted him and provided him with affidavits. *See* Defendant-Appellant's Brief on Appeal (ECF No. 10-10, PageID.810). Petitioner attached two affidavits to his appellate brief.

One affidavit was signed by Jaime Dingman, who states in the affidavit that she worked with Hill, that Hill lied at trial about whether she knew Petitioner, and that Hill discussed the case before, during, and after the trial. (*Id.* at PageID.839). Dingman also avers that Hill asked Petitioner's cousin whether "she should do it or not and his cousin told her not to and she did [it] anyways." (*Id.*)

The other affidavit is signed by Bart William Wright, who states that he also worked with Hill and that Hill was telling him and Petitioner's cousin about the criminal case before the second day of trial.

27

Additionally, according to Wright, Hill had made up her mind the first night of the trial and was providing her co-workers with details about the case, including what the other jurors were thinking and doing. (*Id*. at PageID.841–842).

The Michigan Court of Appeals rejected Petitioner's claim for several reasons. First, the Court of Appeals stated that a juror's violation of an express instruction not to discuss the case was not grounds for a new trial. Next, the Court of Appeals stated that Petitioner waived the claim of error concerning the juror's prior contact, if any, with Petitioner because he did not object to Hill being seated on the jury, and he did not inform the trial court of any relationship with Hill. The Court of Appeals also stated that the Petitioner did not appear to be prejudiced by Hill's knowledge of him through other people, and that Petitioner was not entitled to relief because the trial court instructed the jury to consider only the evidence that was admitted at trial. *Rodea*, 2015 WL 122703, at *11–*12.

28

### 1. Extraneous Influences

The Supreme Court has said that, "[i]In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Remmer v. United States*, 347 U.S. 227, 229 (1954). But "*Remmer* involved different allegations of outside influence," *Cunningham v. Shoop*, 23 F.4th 636, 651 (6th Cir. 2022), and to establish a *prima facie* claim of extraneous influence, a defendant must show that external information was relayed to a juror. *See id.* at 654. The Sixth Circuit Court of Appeals "has defined 'an extraneous influence on a juror [as] one derived from specific knowledge about or a relationship with either the parties or their witnesses.'" *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007) (quoting *United States v. Herndon,* 156 F.3d 629, 635 (6th Cir. 1998)).

The affidavits that Petitioner submitted to the state courts allege that Hill privately communicated with co-workers while Petitioner's trial

29

was still in progress. If this is true, Hill's conduct was improper. But even accepting the affidavits as truthful, they establish that it was Hill who approached outsiders, not outsiders who approached Hill.

Although Dingman's affidavit says that Petitioner's cousin told Hill not to do it, that language is vague. Even if the cousin was encouraging Hill to vote "not guilty" during deliberations, Hill and the other jurors obviously disregarded the cousin's request and chose to convict Petitioner. Petitioner has not made a colorable showing of an extraneous influence on Hill, and he merely speculates that Hill attempted to alter the other jurors' decision with information from outside sources.

### 2. Truthfulness and Bias

Whether Hill was untruthful or made omissions during *voir dire* and was biased in violation of the Sixth Amendment right to an impartial jury is a related, but distinct, question. *See Cunningham*, 23 F. 4th at 660–61. The legal framework for a claim of juror bias based on a juror's nondisclosure of information during a *voir dire* proceeding comes from the Supreme Court's decision in *McDonough Power Equip., Inc. v.*

*Greenwood*, 464 U.S. 548 (1984). *English v. Berghuis*, 900 F.3d 804, 813 (6th Cir. 2018).

"Under *McDonough*, for a prospective juror's nondisclosure to warrant a new trial, a defendant must show that (1) the juror 'failed to answer honestly a material question on *voir dire*,' and (2) 'a correct response would have provided a valid basis for a challenge for cause.' " *Id.* (quoting *McDonough*, 464 U.S. at 556). "[T]he nondisclosure must have denied the defendant his Sixth Amendment right to an impartial jury." *Id.* "The intentional or unintentional nature of a juror's omission has a crucial implication: where the omission was unintentional, the petitioner must show 'actual bias,' but where the omission was intentional, bias may be inferred." *Id.* (citing *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995) (quoting *United States v. Patrick*, 965 F.2d 1390, 1399 (6th Cir. 1992))).

Hill did not acknowledge knowing Petitioner during the *voir dire* proceeding at Petitioner's trial. The only person she claimed to know was a "Ms. Degrace," who was not a party, witness, or attorney involved in

the case, and she stated that knowing Ms. Degrace would not affect her decision. *See* 1/4/12 Trial Tr. at 119-20 (ECF No. 10-6, PageID.443–444).

Dingman stated in her affidavit that Hill lied about whether she knew Petitioner. But both Dingman's affidavit and Wright's affidavit seem to indicate that Hill merely knew of Petitioner through other people, not that she was acquainted with him. If Hill merely knew of Petitioner through other people, it does not appear that she deliberately misled the trial court when she failed to mention Petitioner during *voir dire*. If, on the other hand, she was acquainted with Petitioner through personal contacts with him, Petitioner waived his claim by not objecting to Hill being seated on the jury and by not informing the trial court that he and Hill knew each other. *Rodea*, 2015 WL 122703, at *11.

Furthermore, Petitioner has not shown that Hill was biased against him. Although she had heard about the case, she said that she could base her decision on what she heard in the courtroom, rather than what she heard outside the courtroom. She assured the prosecutor that she had not formed a firm and fixed opinion about the defendants' guilt or innocence based on what she had heard outside the courtroom. 1/4/12

32

Trial Tr. at 122-23 (ECF No. 10-6, PageID.444). The trial court, moreover, charged the jurors to base their decision solely on the admissible evidence, *see* 1/11/12 Trial Tr. at 172 (ECF No. 12-1, PageID.1363), and juries are presumed to follow a trial court's instructions to them. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

For all the foregoing reasons, the state appellate court's rejection of Petitioner's claim was objectively reasonable. Petitioner, therefore, is not entitled to relief on his claim that juror Hill tainted the jury's verdict.

## C.    The Prosecutor's Conduct

Petitioner alleges next that his constitutional right to a fair trial was violated by prosecutorial misconduct. Specifically, Petitioner contends that the prosecutor: (1) compared him to the 9/11 terrorists and the shooters at the Columbine High School; (2) withheld material evidence from him and used it against him; (3) introduced false evidence of Sean Berg's immunity during closing arguments; and (4) placed photographs of the victim's body on the projector screen to incite the jurors' passion and to gain their sympathy. *See* Mem. of Law in Support of Pet. (ECF No. 1, PageID.49).

The Michigan Court of Appeals rejected Petitioner's claim because Petitioner did not preserve his claim for appellate review and because he was not entitled to relief or prejudiced by the alleged errors. *Rodea*, 2015 WL 122703, at \*12. Respondent, therefore, argues, that Petitioner's prosecutorial-misconduct claim is procedurally defaulted and meritless. *See* Answer in Opp'n to Pet. (ECF No. 11, PageID.1264–1267).

### 1. Procedural Default

In the habeas context, a procedural default is "a critical failure to comply with state procedural law." *Trest*, 522 U.S. at 89. Pursuant to the related doctrine, "a federal court will not review the merits of [a state prisoner's] claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). "A habeas petitioner procedurally defaults a claim when '(1) [he] fails to comply with a state procedural rule; (2) the state courts enforce the rule; [and] (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim.'" *Theriot v. Vashaw*, 982 F.3d 999, 1003 (6th Cir. 2020) (quoting *Wheeler v. Simpson*, 852 F.3d 509, 514

34

(6th Cir. 2017) (quoting *Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (*en banc*)).

The relevant state procedural rule here is "the general and longstanding rule in Michigan that 'issues that are not properly raised before a trial court cannot be raised on appeal absent compelling or extraordinary circumstances.'" *People v. Cain*, 498 Mich. 108, 114 (2015) (quoting *People v. Grant,* 445 Mich. 535, 546 (1994)). This contemporaneous-objection rule "provides the trial court 'an opportunity to correct the error, which could thereby obviate the necessity of further legal proceedings and would be by far the best time to address a defendant's constitutional and nonconstitutional rights.'" *Carines*, 460 Mich. at 762 (quoting *Grant*, 445 Mich. at 551).

Petitioner did not object at trial to the prosecutor's alleged misconduct. By failing to object at trial, he violated Michigan's procedural rule regarding contemporaneous objections and the preservation of issues for appellate review. The Michigan Court of Appeals, moreover, enforced the rule by stating that all of Petitioner's allegations of

prosecutorial-misconduct were unpreserved,[3] and the Sixth Circuit Court of Appeals has determined that "Michigan's contemporaneous-objection rule 'constitutes an adequate and independent state ground for foreclosing federal review.'" *Theriot*, 982 F.3d at 1004 (citing *Taylor v. McKee*, 649 F.3d 446, 451 (6th Cir. 2011)). All three procedural default factors are satisfied.

## 2. Cause and Prejudice

"A state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure

---

[3] The appellate court's alternative holding on the merits does not require this Court to disregard the state court's finding that Petitioner's claim was procedurally barred. *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998). As explained in *Harris v. Reed*, 489 U.S. 255 (1989):

> a state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. See *Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S. Ct. 183, 184, 80 L. Ed. 158 (1935). Thus, by applying this doctrine to habeas cases, [*Wainwright v. Sykes*, 433 U.S. 72 (1977)] curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision. In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.

*Id.* at 264 n.10 (emphasis in original).

36

to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Davila v. Davis*, 137 S. Ct. 2058, 2064–65 (2017) (quoting *Wainwright v. Sykes,* 433 U.S. 72, 84 (1977)). Petitioner alleges that his trial counsel was ineffective for failing to object to the prosecutor's conduct and failing to preserve these claims for appellate review. *See* Mem. of Law in Support of Pet. at 51–52 (ECF No. 1, PageID.72–73).

Ineffective assistance of counsel can be "cause" for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013). "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *see also Davila*, 137 S. Ct. at 2062 ("[A]ttorney error does not qualify as 'cause' to excuse a procedural default unless the error amounted to constitutionally ineffective assistance of counsel.")

To prevail on his claim about trial counsel's effectiveness, petitioner must show that trial "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*,

37

466 U.S. 668, 687 (1984). The deficient performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The Court proceeds to examine each of Petitioner's claims of prosecutorial misconduct to determine whether trial counsel's failure to object to the conduct was constitutionally ineffective assistance and "cause" for Petitioner's procedural default.

### a. Comparing Petitioner to Other Attackers

Petitioner alleges first that the prosecutor injected grossly improper remarks into the trial during the *voir dire* proceeding. He contends that prosecutor's unwarranted characterizations were

38

impermissible foul blows that violate due process. *See* Mem. of Law in Support of Pet. (ECF No. 1, PageID.50).

It is true that prosecutors may not strike foul blows. *Berger v. United States*, 295 U.S. 78, 88 (1935). Nor may they attempt to incite the jury's passions and prejudice with irrelevant remarks to the jury. *Vireck v. United States,* 318 U.S. 236, 247 (1943). But the disputed remarks in Petitioner's case occurred when the prosecutor was trying to explain the concept of transferred intent to the jury pool. The remarks read as follows:

> I want to talk about transferred intent just one more time. . . . And [venireperson Brown], some years ago a couple of young folks, for whatever reason, were very angry, and walked into a high school and kind of indiscriminately shot a bunch of people, killed a bunch of people. And it appears from the situation, that they didn't really care who it was that they were killing. If it was this specific person, or that person, they were happy to kill whoever. Just because they weren't able to say I am here to kill Kathleen Green, or some specific person, do you in any way think that what they did was not murder?

> . . . .

> If the individuals, for whatever reason, were so angry that they took a plane and flew it into a building and set it on fire, killing thousands of people, without knowing the name of a

39

single person in that building, or those buildings, do you think for a minute that it wasn't murder?

1/4/12 Trial Tr. at 81–82 (ECF No. 10-6, PageID.434).

Petitioner contends that the prosecutor was referring to the Columbine High School shooting and the 911 terrorist attacks. While that may be true, the prosecutor was not comparing Petitioner to mass murderers or terrorists. Rather, he was explaining the concept of transferred intent. And the use of the transferred-intent theory was appropriate because the evidence established that the defendants fired at the exterior of two occupied taverns with no particular person in mind.

Furthermore, the trial court instructed the jurors at the beginning of the trial and at the close of the case that the attorneys' statements and arguments were not evidence and that the jurors should consider only the admissible evidence. *See id.* at 142–43, 152–54 (*Id.* at PageID.449, 452); 1/11/12 Trial Tr. at 170–72 (ECF No. 12-1, PageID.1362–1363).

The prosecutor's remarks were proper, and any prejudice to Petitioner was mitigated by the trial court's instructions to the jury.

Therefore, defense counsel was not ineffective for failing to object to the prosecutor's remarks.

### b. Withholding Material

Petitioner alleges that the prosecutor violated his right to due process, as interpreted in *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to timely disclose material evidence from him and then using the evidence against him. The evidence in question was cell phone records, which were used to show that Petitioner and Rembish were near the two bars at the time of the shootings. Petitioner alleges that the cell phone records were the only evidence that he was near the crime scene and that he admitted his guilt to Berg during a phone call. *See* Mem. in Support of Pet. (ECF No. 1, PageID.51–52).

In *Brady*, the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A true *Brady* claim has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or

41

because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Here, the cell phone records were not the only evidence that implicated Petitioner in the crimes. Berg testified that Petitioner had called him and said that he had "messed up" and wanted Berg to take care of his son, his girlfriend, and his girlfriend's daughter because he was probably going away for the rest of his life. *See* 1/6/12 Trial Tr. at 65–66 (ECF No. 10-8, PageID.575). Petitioner himself testified that he may have talked to Berg over the phone before he was arrested. *See* 1/11/12 Trial Tr. at 63–64 (ECF No. 12-1, PageID.1336).

Furthermore, neither the cell phone records, nor Petitioner's conversation with Berg after the shooting, were exculpatory. Quite the opposite, in fact. Therefore, Petitioner has failed to state a *Brady* claim, and trial counsel was not ineffective for failing to object to the prosecutor's alleged failure to timely disclose the cell phone records.

42

### c. The Remarks about Sean Berg's Immunity

Petitioner alleges next that the prosecution introduced false evidence about Sean Berg's immunity during closing arguments. Petitioner has not explained what was false about the prosecutor's remarks. His real argument appears to be that the prosecution used the grant of immunity to prove its case and that Berg should not have been granted immunity because he initially admitted to lying to the police. *See* Mem. of Law in Support of Pet. at 31–33 (ECF No. 1, PageID.52–54).

The purpose of granting immunity to a witness is to obtain the witness's testimony, *United States v. Ware,* 161 F.3d 414, 422 (6th Cir. 1998), and the grant of immunity to Berg was explained to Petitioner's jury. The defense attorneys also were able to cross-examine Berg about the agreement. Berg, moreover, testified that he provided the police with information about the crimes *before* he was charged with unrelated crimes in Bay County and before he was granted immunity in the cases brought against Petitioner and Rembish. *See* 1/6/12 Trial Tr. at 81–85 (ECF No. 10-8, PageID.579–580).

43

For all these reasons, the prosecution's grant of immunity to Berg was not improper. And because the prosecutor did not engage in misconduct by using Berg to help prove his case, defense counsel was not ineffective for failing to object to the use of Berg as a prosecution witness.

### d. Gruesome Photographs

Petitioner's final prosecutorial misconduct claim is that the prosecutor should not have placed photographs of the victim's body on the projector screen during closing arguments. Petitioner estimates that the photographs remained on the projector screen from 1:45 p.m. to 4:20 p.m. He asserts that the only reason for displaying the photographs was to incite the jury's passion and to make the jurors sympathize with the victim. *See* Mem. in Support of Pet. at 33–35 (ECF No. 1, PageID.54–56).

Photographs of the victim had already been admitted in evidence, *see* 1/5/12 Trial Tr. at 35, 73–79 (ECF No. 10-7, PageID.487, 496–98), and even gruesome photographs may be admitted in evidence under state law because they tend to prove the shooter's intent and to corroborate testimony about the cause of the victim's death. *See People v. Gayheart*, 285 Mich. App. 202, 227 (2009). Therefore, an objection to the use of

photographs during closing arguments would have been futile, and "counsel was under no professional obligation to make meritless objections." *Conley v. Warden Chillicothe Corr. Inst.*, 505 F. App'x 501, 508 (6th Cir. 2012).

For all the reasons given above, the prosecutor's conduct and remarks did not deprive Petitioner of a fair trial. It follows that defense counsel was not constitutionally ineffective for failing to object to the prosecutor's conduct or remarks. Because counsel was not ineffective, there is no "cause" to excuse Petitioner's procedural default, *Smith v. Warden, Toledo Corr. Inst.*, 780 F. App'x 208, 230 (6th Cir. 2019), and without "cause," the Court need not consider whether Petitioner has shown prejudice. *Benton v. Brewer,* 942 F.3d 305, 308 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 273 (2020).

### 3. Miscarriage of Justice

In the absence of "cause and prejudice," a habeas petitioner may pursue procedurally defaulted claims if he can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A fundamental

45

miscarriage of justice results from the conviction of one who is 'actually innocent.' " *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Carrier*, 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Petitioner has not presented the Court with any new and reliable evidence of actual innocence. Therefore, a fundamental miscarriage of justice will not result from this Court's failure to adjudicate the substantive merits of Petitioner's claim. His prosecutorial-misconduct claim is procedurally defaulted.

## D. The Joint Trial

The fourth habeas claim alleges that Petitioner's right to a fair trial was violated because the trial court denied his motion for a separate trial from Rembish. Petitioner contends that Rembish's and his defenses were mutually exclusive, and if he had been tried separately from Rembish,

the jury would not have heard prejudicial evidence that pertained only to Rembish. Petitioner also speculates that, if the trial court had severed his case, the prosecutor would have offered to let him plead guilty to far lesser charges to avoid a trial. *See* Mem. in Support of Pet. at 35–38 (ECF No. 1, PageID.56–59).

### 1. Clearly Established Federal Law

The Supreme Court has observed that "[j]oint trials play a vital role in the criminal justice system." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). "They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (quoting Marsh, 481 U.S. at 210). "For these reasons, [the Supreme Court has] repeatedly approved of joint trials." *Id*. Furthermore, as set forth in *Stanford v. Parker*, 266 F.3d 442 (6th Cir. 2001),

> [a] defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial. *See Zafiro v. United States*, 506 U.S. 534, 540, 113 S. Ct. 933, 122 L.Ed.2d 317 (1993). Nor does he have a right to a separate trial merely because defendants present antagonistic defenses. *See United States v. Day*, 789 F.2d 1217, 1224 (6th

Cir. 1986) (holding that absent some indication that the alleged antagonistic defendants misled or confused the jury, the mere fact that co-defendants blame each other does not compel severance). Courts should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933.

*Id.* at 458–59.

Severance is governed by state law, *Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002), and, in Michigan, severance is mandated "only when a defendant demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *People v. Hana*, 447 Mich. 325, 331 (1994).

### 2. Application of the Law

Petitioner argued in state court that severance was necessary because he planned to testify that Rembish possessed his cell phone during the shootings, and he anticipated that Rembish would deny possessing the phone. Petitioner maintained that Rembish's and his defenses were incompatible because each defendant would claim that the

48

other defendant possessed the phone. *See* Mot. for Separate Trials (ECF No. 10-10, PageID.879–880).

The Michigan Court of Appeals rejected Petitioner's severance claim because his "defense did not hinge on possession of the cell phone, but on a claim that he was not present at the shootings." *Rodea*, 2015 WL 122703, at *15. The Court of Appeals concluded that, although the cell phone record supported a finding that Petitioner committed the crimes with Rembish, the evidence "was not so essential that it constituted 'core' evidence so as to require separate trials." *Id.*

Ultimately, Petitioner testified at trial that he went to Rembish's home after the fight and that he was not present during the shooting. This defense was not incompatible with Rembish's defense that there was no direct or physical evidence linking Rembish to the crimes.

Furthermore, the trial court instructed the jurors at the beginning of the trial and at the conclusion of the case to consider each defendant separately. The court said that the joint trial was not evidence that the two defendants were associated with each other or that either one was guilty. The Court also said that each defendant was entitled to have his

49

guilt or innocence decided individually. *See* 1/4/12 Trial Tr. at 131, 136, 150–51 (ECF No. 10-6, PageID.446, 448, 451); 1/11/12 Trial Tr. at 174–75, 185 (ECF No. 12-1, PageID.1363-64, 1366).

Given these instructions and the fact that Petitioner's defense was not inconsistent with Rembish's defense, the joint trial did not violate Petitioner's right to a fair trial, and the state appellate court's rejection of Petitioner's claim was not objectively unreasonable. Petitioner has no right to relief on his claim.

### E. Trial and Appellate Counsel

Petitioner's fifth and final claim alleges that his appellate attorney was ineffective for failing to raise claims that trial counsel should have raised. Petitioner also contends that appellate counsel was ineffective for failing to: (1) acquire the transcript of his preliminary examination and the pretrial motions and discovery materials in his case; (2) provide him with a copy of counsel's appellate brief; (3) raise a claim that the cumulative effect of errors deprived him of a fair trial; and (4) raise the claims that Petitioner presented on appeal. *See* Mem. in Support of Pet. (ECF No. 1, PageID.59–61).

### 1. Whether the Ineffectiveness Claims are Procedurally Defaulted

Respondent argues that most of Petitioner's claims about trial counsel are procedurally defaulted because Petitioner failed to raise the claims on direct appeal and the trial court relied on that omission to deny relief. *See* Answer in Opp'n to Pet. (ECF No. 11, PageID.1280–1283). The state procedural rule at issue is the rule governing motions for relief from judgment. It reads in relevant part as follows:

> (D) Entitlement to Relief. The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
>
> . . . .
>
> (2) alleges grounds for relief which were decided against the defendant in a prior appeal or proceeding under this subchapter, unless the defendant establishes that a retroactive change in the law has undermined the prior decision;
>
> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates

51

>   (a) good cause for failure to raise such
>   grounds on appeal or in the prior
>   motion, and
>
>   (b) actual prejudice from the alleged
>   irregularities that support the claim for
>   relief.

Mich. Ct. R. 6.508(D)(2) and (3).

Petitioner raised his claims about appellate counsel and most of his claims about trial counsel for the first time as a new issue in the Michigan Supreme Court. Although he could not be expected to complain about appellate counsel in the Michigan Court of Appeals while he was represented by the attorney, he could have raised his claims about trial counsel in the Court of Appeals. The critical issue, however, is whether the state courts enforced Rule 6.508(D)(3).

When determining whether a state court enforced a state procedural rule, habeas courts must look to the last reasoned state court opinion rejecting the petitioner's claims. *Guilmette*, 624 F.3d at 291. "[A] procedural default does not bar consideration of a federal claim on . . . habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state

52

procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (internal quotation marks omitted).

The last state court to issue a reasoned opinion on Petitioner's claims about trial and appellate counsel was the state trial court on collateral review of Petitioner's convictions. That decision was ambiguous for the following reasons.

First, the court stated that all of Petitioner's claims about defense counsel and appellate counsel could have been raised in Petitioner's original appeal. *See People v. Rodea,* No. 11-035678-FC, Order and Op. at p. 2 (Saginaw Cty. Cir. Ct. Jan. 13, 2017); (ECF No. 10-12, PageID.1115). Next, the court made the contradictory statement that the Michigan Court of Appeals had already addressed Petitioner's claims about trial counsel. *Id*. The court then took the position that, except for Petitioner's claims about appellate counsel, all of Petitioner's arguments could have been raised on appeal or were already ruled on by the Court of Appeals. *Id*. The court did not specify which claims could have been raised on appeal and which claims had already been decided by the Court of Appeals.

53

The next paragraph in the trial court's order is no clearer. The court stated that the issue of trial counsel's ineffectiveness had already been ruled on by the Court of Appeals. *Id*. Yet in the next sentence, the trial court stated that Petitioner could have made the ineffectiveness argument in a brief before the Court of Appeals. *Id*.

The state court inexplicably concluded both that Petitioner was precluded from raising his claims about trial counsel because the claims had already been litigated on direct appeal *and* that the claims were barred because Petitioner failed to raise the claims on direct appeal. The rejection of Petitioner's claims under Rule 6.508(D)(2) is not a bar to federal habeas review, *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013), and the trial court did not clearly and expressly state that its decision rested on the procedural bar found in Rule 6.508(D)(3).

"At most, the order is ambiguous, and . . . ambiguous orders do not provide adequate and independent state grounds." *Id*. at 511 (citing *Guilmette*, 624 F.3d at 289–92). Petitioner's claims about trial counsel are not procedurally defaulted and the Court will address the merits of Petitioner's claims about his former attorneys.

54

## 2.    Clearly Established Federal Law

Petitioner alleges that both his trial attorney and his appellate attorney were ineffective for failing to raise certain issues in the state courts. The clearly established federal law for an ineffective-assistance-of-counsel claim is *Strickland v. Washington*. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

To establish that trial counsel's assistance was so defective as to require reversal of a conviction, a convicted person must show that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Because of the difficulties inherent in evaluating an attorney's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

A deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 111–12 (quoting *Strickland*, 466 U.S. at 693).

The *Strickland* standard applies to allegations about appellate counsel as well. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Jackson v. Bradshaw*, 681 F.3d 753, 774 (6th Cir. 2012). To prevail on a claim about appellate counsel, a petitioner must show: (1) that the attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal; and (2) there is a reasonable probability that the petitioner would have prevailed on appeal if his attorney had raised the issues. *Robbins*, 528 U.S. at 285 (citing *Strickland*, 466 U.S. at 687-91, 694).

56

When determining whether an appellate attorney's failure to raise an issue prejudiced a habeas petitioner, a habeas court must assess the strength of the claims that appellate counsel failed to raise on appeal. *Carter v. Parris*, 910 F.3d 835, 841 (6th Cir. 2018) (citing *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008)). "If there is no 'reasonable probability that inclusion of the issue would have changed the result of the appeal,' then habeas relief will not be granted." *Id.* (quoting *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004)). With these principles in mind, the Court proceeds to address each of Petitioner's claims about trial counsel.

### 3.   Trial Counsel's Alleged Errors

### a. Voluntary Intoxication

Petitioner alleges that defense counsel was ineffective for failing to introduce properly a defense of voluntary intoxication. Petitioner contends that defense counsel should have elicited testimony from him that he was not a regular drinker and that he lost control of himself when his friends pressured him into drinking too much. Petitioner argues that

this testimony would have helped establish an intoxication defense. *See* Mem. in Support of Pet. at 41–43 (ECF No. 1, PageID.62–64).

The facts adduced at trial did not support Petitioner's argument that his friends pressured him into drinking or that he was unaware of the effect excessive drinking would have on him. He admitted to drinking at Rembish's home and at two bars before he and his friends went to the Corner Lounge. He also admitted that he was "getting buzzed" before he reached the Corner Lounge, and he stated that he and his friends were celebrating David Nietzelt's birthday. *See* 1/11/12 Trial Tr. at 40–48, 76–77 (ECF No. 12-1, PageID.1330–1332, 1339).

To his credit, defense counsel elicited testimony about the extent to which Petitioner had been drinking, the type of alcoholic drinks he consumed, and how the drinking affected him. What is more, Petitioner was able to establish on cross-examination by the prosecution that he was merely an occasional or casual drinker and that he did not drink heavily on a regular basis. *Id*. at 76–77 (*Id*. at PageID.1339).

58

Defense counsel's questioning of Petitioner regarding his intoxication was adequate, and any deficiency did not prejudice Petitioner. Therefore, Petitioner has no right to relief on this claim.

### b. The Jury Instructions

Petitioner alleges that his attorney was ineffective for failing either to move for a new trial or to object to the trial court's jury instruction on voluntary intoxication. The trial court instructed the jury as follows:

> There's been some evidence that the defendant was voluntarily intoxicated with alcohol or drugs when the alleged crimes were committed. Voluntary intoxication is not a defense to the crimes charged here so it does not excuse the defendant if he committed this crime.

*Id.* at 189, PageID.1367.

Petitioner maintains that he could not have known how much alcohol it would take to lose control of himself because he was not a regular drinker. Thus, according to him, defense counsel was ineffective for failing to object to the lack of a jury instruction on the affirmative defense that he voluntarily consumed alcohol, but did not know, and could not have known, that he would become intoxicated or impaired.

59

The Michigan statute on voluntary intoxication states that: "It is an affirmative defense to a specific intent crime . . . that he or she voluntarily consumed a legally obtained and properly used medication or other substance and did not know and reasonably should not have known that he or she would become intoxicated or impaired." Mich. Comp. Laws § 768.37(2). Petitioner, however, admitted at trial to being aware that he was "getting buzzed" before he reached the Baywood Bar, which was where he and his friends went prior to going to the Corner Lounge. There was no evidence that he did not know, or could not have known, that he would become intoxicated or impaired. Thus, Mich. Comp. Laws § 768.37(2) did not apply, and defense counsel was not ineffective for failing to move for a mistrial or for failing to object to the trial court's jury instruction on voluntary intoxication.

### c. Venue

Petitioner alleges that defense counsel should have moved for a change of venue because some jurors were exposed to media reports about the case, and some jurors knew people involved in the case. He also asserts that the community had voiced its hatred for him before trial.

60

The Sixth Amendment to the United States Constitution guarantees the accused in a criminal prosecution the right to a trial by "an impartial jury[.]" U.S. Const. amend. VI. This right is "applicable to the States through the Due Process Clause of the Fourteenth Amendment." *Parker v. Gladden*, 385 U.S. 363, 364 (1966). "The failure to accord an accused a fair hearing violates even the minimal standards of due process," *Irvin v. Dowd*, 366 U.S. 717, 722 (1961), and "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (explaining the holding in *Irwin*).

But "[t]he category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow." *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998). The Sixth Circuit Court of Appeals has

> characterized presumptive prejudice as a "circus-like atmosphere" that "pervades both the courthouse and surrounding community." Simple exposure of jurors to pretrial publicity "does not presumptively establish that the defendant was denied a fair trial."

61

*United States v. Poulsen*, 655 F.3d 492, 507 (6th Cir. 2011) (internal and end citations omitted). When the partiality of an individual juror is at issue, the question "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton*, 467 U.S. at 1036.

The transcript of Petitioner's trial does not reveal a circus-like atmosphere that pervaded the courthouse and surrounding community. In fact, when Petitioner's attorney asked the venirepersons whether any of them had heard about the case, the three people who had heard or read about the case stated that they had not formed an opinion or did not remember any details about the case. *See* 1/4/12 Trial Tr. at 85–87 (ECF No. 10-6, PageID.435).

Later in the proceeding, one juror stated that she knew both defendants. But she was excused after she admitted that knowing the defendants would affect her ability to be fair and impartial. *Id*. at 110 (*Id*. at PageID.441.)

62

Still later, after more potential jurors were seated in the jury box, Amanda Hill stated that she had heard about the case. But as noted above in the discussion on Petitioner's second claim, Hill stated that she could base her decision on what she heard in the courtroom, rather than what she had heard outside the courtroom. She also stated that she had not formed a firm and fixed opinion about the Petitioner's guilt based on what she had heard outside the courtroom. *Id.* at 122–23 (*Id.* at PageID.444).

Another venireperson had heard about the case, too. When asked whether the juror had heard about the case in the news, the juror stated: "The only thing I heard was about the smoking ban. They were going around—going around all the bars and busting people for smoking. And that was brought up at the end, that there was a shooting at the Corner Lounge." *Id.* at 124 (*Id.* at PageID.445).[4] The lawyers asked whether that

---

[4] Still other jurors admitted for various reasons unrelated to pretrial publicity about the case that they could not be fair and impartial. All of those jurors were excused for cause. *See* 1/4/12 Trial Tr. at 27–28 (ECF No. 10-6, PageID.420–421 (Juror No. 24 who knew a detective and a police officer); *id* at 42–43, PageID.424 (Juror No. 8 who knew the victim's brothers); *id.* at 50, PageID.426 (Juror No. 11 who said that he could not be fair because of his past involvement with a drunk driver who was not convicted); *id.* at 53, PageID.427 (Juror No. 28 who stated that he or she

was all the juror had heard about the case and the juror responded, "Pretty much. It was all about the smoking ban." *Id*. (*Id*.)

Petitioner has failed to show that negative pretrial publicity pervaded the community and prevented him from getting a fair trial. He also has failed to argue convincingly that the jurors' protestations of impartiality should not have been believed. Therefore, defense counsel was not ineffective for failing to move for a change of venue.

### d. The Presentence Investigation Report

Petitioner's fourth claim about trial counsel alleges that counsel did not correct false information in his presentence investigation report. The allegedly false information was that Petitioner began using alcohol when he was fifteen years old, consumed alcohol frequently, and sold drugs. *See* Mem. in Support of Pet. at 46–47 (ECF No. 1, PageID.67–68).

---

was bitter and had no faith in the judicial system because a cousin was falsely accused of murder and incarcerated for eleven years); *id*. at 54, PageID.427 (Juror No. 20 who claimed to be thinking about her daughter who had been convicted of two felonies); *id*. at 113–14, PageID.442 (Juror No. 21 who previously was represented by Petitioner's attorney); *id*. at 114–15, PageID.442 (Juror No. 22 who did not think she could be fair because her brother was serving a life sentence for first-degree murder); *id*. at 115–16, PageID. PageID.442–43 (Juror No. 25 who apparently knew an assistant prosecutor in the civil division of the prosecutor's office).

Defense counsel did object to a sentence in the report that said Petitioner had acknowledged possessing cocaine for purposes of sale, and the trial judge agreed not to consider that information. *See* 2/16/12 Sentence Tr. at 3 (ECF No. 12-2, PageID.1417). Defense counsel had no other additions or corrections to the report, but neither did Petitioner, even though he was given an opportunity to address the trial court. *Id.* at 4 (*Id.* at PageID.1418).

Furthermore, there is not a substantial likelihood that defense counsel's failure to object to information about Petitioner's past use of alcohol would have made a difference in his sentence. The felony-firearm conviction carried a mandatory sentence of two years, *see* Mich. Comp. Laws § 750.227b(1), and the murder conviction carried a mandatory sentence of life imprisonment without eligibility for parole. Mich. Comp. Laws § 750.316(1). Defense counsel's failure to object to information in the presentence investigation report about Petitioner's use of alcohol did not prejudice Petitioner.

65

### e. Failure to Investigate and Retrieve *Brady* Materials

Petitioner asserts that defense counsel failed to investigate and retrieve the following materials: a video from the self-serve lumber yard across the street from the Corner Lounge; Sean Berg's and Rembish's phone records; and documents pertaining to Sean Berg's unrelated criminal case and immunity agreement. Petitioner asserts that this evidence was identified in the discovery materials, but the prosecutor suppressed it, and defense counsel never bothered to obtain the materials. *See* Mem. in Support of Pet. at 47–48 (ECF No. 1, PageID.68–69).

The Supreme Court stated in *Strickland* that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have

good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

In the present case, there is no indication that a video from the lumber yard was exculpatory or even helpful. One witness indicated that the lumber business was a block away from the Corner Lounge. *See* 1/5/12 Trial Tr. at 142 (ECF No. 10-7, PageID.513). So, it would have been reasonable for defense counsel to conclude that further investigation of the video was unnecessary.

Regarding the cell phone records, the raw data and a prosecution expert's analysis of the data were made available to Petitioner's initial attorney by October 31, 2011. *See* 11/1/11 Mot. Hr'g Tr. at 5–25 (ECF No. 10-4, PageID.388–393). Petitioner's trial attorney was appointed on December 12, 2011, *see* Saginaw County Circuit Court Register of Actions (ECF No. 10-1, PageID.142), and the trial began on January 4, 2012, *id.* at PageID.142). Defense counsel had enough time to digest the information, and it appears that he chose to limit his cross-examination of the expert witness as a matter of trial strategy by asking only a few key questions. *See* 1/10/12 Trial Tr. at 187–88 (ECF No. 10-9,

PageID.690). Petitioner's attorney also may have made a strategic decision to rely on the other defense attorney's knowledge of, and cross-examination of, the prosecution's expert witness on cell phone calls, cell phone towers, and the sectors the towers covered. *See id.* at 197–203 (*Id.* at PageID.692-694).

As for Sean Berg's grant of immunity, that issue was explored in depth at trial. Counsel for Petitioner first raised the issue. He elicited testimony that Berg would not be charged with anything regarding the incidents at the two bars and that Berg expected some help from the prosecution for firearm charges pending against him in Bay County. *See* 1/6/12 Trial Tr. at 69–72 (ECF No. 10-8, PageID.476–477). Counsel for Rembish also raised the issue and brought out additional details about the grant of immunity. *Id.* at 74–78 (*Id.* at PageID.577–578).

Petitioner has not shown that defense counsel's alleged failure to investigate the facts or obtain discovery materials amounted to deficient performance and that any deficiencies in counsel's pretrial investigation prejudiced his defense. As such, defense counsel was not ineffective.

### f. The Alleged Lack of a Jury Instruction on Informants

Petitioner alleges that Sean Berg was an informant for the prosecution and, therefore, defense counsel should have requested a jury instruction on informants who testify. *See* Mem. in Support of Pet. at 48–49 (ECF No. 1, PageID.69–70). Berg, however, was thoroughly examined and cross-examined about his motive for testifying against the defendants.

Additionally, the trial court instructed the jurors that they could consider Berg's past criminal conviction, along with all the other evidence, when deciding whether they believed his testimony and how important they thought it was. *See* 1/11/12 Trial Tr. at 177–78 (ECF No. 12-1, PageID.1364). In another jury instruction, the court pointed out that Berg had made an agreement with the prosecution regarding charges brought against him in Bay County and that he was granted testimonial immunity for his truthful testimony in Petitioner's and Rembish's case. The court stated that the jurors could consider this

69

evidence as it related to Berg's credibility and whether it tended to show his bias or self-interest. *See id* at 179 (*Id.* at PageID.1365).

The trial court's jury instructions and the cross-examinations of Berg sufficiently protected Petitioner's right to defend himself. Therefore, defense counsel was not ineffective for failing to request a jury instruction on informants.

### g. The Lack of a Defense Expert

Petitioner contends that defense counsel should have obtained an expert on cell phone data because the data placed him at the crime scene and an expert was needed to assist counsel in understanding the data. Petitioner also contends that trial counsel failed to vigorously cross-examine the prosecution's expert on cell phone data. *See* Mem. in Support of Pet. at 49–50 (ECF No. 1, PageID.70–71).

"It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts[.]" *Richter*, 562 U.S. at 106. Yet "[t]here are . . . 'countless ways to provide effective assistance in any given case,'" and "[e]ven the best criminal defense attorneys would

not defend a particular client in the same way." *Id.* (quoting *Strickland*, 466 U.S. at 689).

Petitioner's trial attorney could have concluded from the analysis provided by the prosecution's expert witness that he did not need an expert witness to help him interpret the raw data. He also could have concluded that counsel for Rembish was capable of challenging the conclusions reached by the prosecution's expert witness. This would have been a reasonable conclusion, given the skill with which counsel for Rembish cross-examined the witness.

Petitioner's attorney "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 107. "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.* at 106 (quoting *Strickland*, 466 U.S. at 689). The Court, therefore, finds that defense counsel was not ineffective for failing to obtain an expert witness on cell phone data.

### h. Failure to Investigate

In his ninth claim about trial counsel, Petitioner reiterates some of his previous claims about trial counsel. He alleges that his trial attorney failed to investigate any of the evidence and should have requested an investigator or consulted an expert on cell phone records. He also alleges that trial counsel should have investigated the video of the lumber yard across the street from the Corner Lodge. *See* Mem. in Support of Pet. at 50–51 (ECF No. 1, PageID.71–72).

The Court has already determined that defense counsel was not ineffective for failing to obtain an expert witness on cell phone data, and Petitioner merely speculates that the video from the lumber yard would have shown that he was not in the car with Rembish.

The record, moreover, indicates that defense counsel was prepared for trial, and given the strength of the prosecution's case, there is not a substantial probability that the result of the trial would have been different had defense counsel further investigated the case. Therefore, defense counsel's alleged deficiencies did not prejudice Petitioner.

### i. Failure to Object and Preserve the Record

Petitioner blames his attorney for making only one objection at trial and for not objecting to the prosecutor's conduct and reference to the 9/11 terrorists and shooters at the Columbine High School. *See id.* at 51–52 (*Id.* at PageID.72–73). Petitioner raised this issue in the Michigan Court of Appeals, which determined that deciding not to object to the prosecutor's conduct did not amount to ineffective assistance because no misconduct occurred. *Rodea*, 2015 WL 122703, at *13.

This Court agrees with the Michigan Court of Appeals. The prosecutor made the disputed remarks when explaining the legal principle of transferred intent. Because the remarks were not improper, defense counsel was not ineffective for failing to object to the remarks.

As for Petitioner's broad claim that defense counsel did not object to anything, the Court of Appeals stated that Petitioner had abandoned his claim by not providing any more details. *Id.* at *14. In his habeas brief, Petitioner refers to many places in the record where defense counsel failed to make an objection. *See* Mem. in Support of Pet. at 52 (ECF No. 1, PageID.73). But he has not identified any objections that

defense counsel could or should have made. The Court, therefore, concludes that trial counsel's performance was not deficient and that the lack of any objections did not prejudice the defense. *Cf. Moss v. Hofbauer*, 286 F.3d 851, 868–69 (6th Cir. 2002) (stating that the problem with the petitioner's argument about defense counsel's failure to conduct a meaningful adversarial challenge was that the petitioner did not identify any witnesses that counsel should have called or any objections that counsel should have made).

### j. Failing to Cross-Examine Witnesses

Petitioner points out that his trial attorney failed to cross-examine many prosecution witnesses. *See* Mem. in Support of Pet. at 52–53 (ECF No. 1, PageID.73–74). However, Petitioner has not alleged what his attorney should have asked the witnesses, and there was no apparent need to cross-examine many of the witnesses. *See, e.g.,* 1/5/12 Trial Tr. at 65–69 (ECF No. 10-7, PageID.494–495) (Louise Harvey-Wilson's testimony about selling her car to Rembish); *id.* at 70–82 (*Id.* at PageID.495–498 (Dr. Kanu Virani's testimony about the autopsy); *id.* at 168–71 (*Id.* at PageID.520–521) (Jeff Smith's testimony about the car

74

supposedly used in the murder and Danielle Kuebler previously asking him to put the car in his name because Danielle did not have a license); *id.* at 171–82, PageID.521–523 (Tyler Payea's identification of some photographs and testimony about Rembish's role in the fight); 1/6/12 Trial Tr. at 123–28 (ECF No. 10-8, PageID.589–591) (Brittany Kollman's testimony about Rembish's letter in which he blamed Sean Berg for being in jail); *id.* at 128–31 (*Id.* at PageID.591) (Joshua Hodges' testimony about an unknown person breaking his nose during the fight at the Corner Lounge); *id.* at 154–63, PageID.597–599 (police officer Ryan Patterson's testimony about being dispatched to both bars on February 18 or 19, 2011); 1/10/12 Trial Tr. at 8–15 (ECF No. 10-9, PageID.645–647) (Barry Nelson's testimony about the 911 emergency calls from the two bars); *id.* at 16–19 (*Id.* at PageID.647–648) Officer Steven Wietecha's testimony about being dispatched to the Corner Lounge on February 19, 2011, observing bullet holes on a door to the Lounge, and receiving a bullet from a patron of the bar); *id.* at 20–23, PageID.648–649 (Officer Kyle Bucholtz' testimony about finding a fired bullet in the victim's clothing); *id.* at 24–27, PageID.649–650 (Officer Stephen Woodcock's

testimony about spent casings that he found in the street, directly in front of a door to the Corner Lounge); *id.* at 27–35, PageID.650–652 (Detective Randy Mudd's testimony regarding bullet holes in the Maples Gardens Bar and in a vehicle parked outside the bar); *id.* at 35–37, PageID.652 (Officer Jeff Madaj's testimony about a casing that a resident found across the street from the Maple Gardens bar).

Petitioner alleges that defense counsel's cross-examination of the remaining witnesses was brief, irrelevant, unimportant, redundant, or unnecessary. *See* Mem. in Support of Pet. (ECF No. 1 at 53, PageID.74). However, defense counsel's cross-examination of witnesses appears to have been a matter of trial strategy. For example, when cross-examining Detective Fink, who was qualified as an expert in the analysis of cellular phone data, Petitioner's attorney went straight to the point. He elicited critical evidence that the phone records did not reveal who was using the phones or what was said. *See* 1/10/12 Trial Tr. at 187–88 (ECF No. 10-9, PageID.690). Counsel for Rembish then questioned Detective Fink about technical aspects of his analysis.

76

An attorney's strategic decisions on how to proceed at trial generally are afforded great deference. *Higgins v. Renico*, 362 F. Supp. 2d 904, 916 (E.D. Mich. 2005). Thus, "[c]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) (quoted with approval in *Jackson v. Bradshaw*, 681 F.3d at 765. The Court concludes that defense counsel's cross-examination of witnesses did not amount to ineffective assistance.

### k. Failure to Object on Double Jeopardy Grounds

Petitioner alleges that he was charged, convicted, and sentenced for six counts of felony firearm. He contends that the charges were duplicative and that defense counsel should have filed a motion based on his state and federal constitutional rights not to be placed in double jeopardy. *See* Mem. in Support of Pet. at 53–43 (ECF No. 1, PageID.74–75).

The Double Jeopardy Clause of the Fifth Amendment "protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled in part on other grounds by*

*Alabama v. Smith,* 490 U.S. 794 (1989). Petitioner was convicted of, and punished for, six counts of felony-firearm. This was permissible because the Michigan "Legislature intended, with only a few narrow exceptions, that every felony committed by a person possessing a firearm result in a felony-firearm conviction." *People v. Morton*, 423 Mich. 650, 656 (1985) (footnote omitted).[5]

Each felony-firearm charge in Petitioner's case was linked to one of the other six felony charges. Thus, the six counts of felony-firearm did not violate double-jeopardy principles, and defense counsel was not ineffective for failing to file a motion based on the state or federal double-jeopardy clauses.

To the extent Petitioner is arguing that his right not to be placed in double jeopardy was violated because he was charged with felony-firearm *and* discharge of a firearm, carrying a dangerous weapon with unlawful intent, and felon in possession of a firearm, that claim also fails. "What

---

[5] The exceptions noted in the omitted footnote are for violations of the concealed-weapon statute, Mich. Comp. Laws § 750.227, and the statute governing a licensee's unlawful possession of a pistol, Mich. Comp. Laws § 750.227a.

determines whether the constitutional prohibition against multiple punishments has been violated is the state legislature's intent concerning punishment." *Jackson v. Smith*, 745 F.3d 206, 211 (6th Cir. 2014).

It is clear from state-court decisions that the Michigan Legislature intended the felony-firearm statute to apply to those who intentionally discharge a firearm at a dwelling or occupied structure. *See People v. Guiles*, 199 Mich. App. 54, 59–60 (1993). Convictions for both felony-firearm and carrying a dangerous weapon with unlawful intent have been upheld as well. *See People v. MacMillan*, 95 Mich. App. 292, 295–96 (1980). And the Michigan Legislature "clearly intended to permit a defendant charged with felon in possession to be properly charged with an additional felony-firearm count." *People v. Dillard*, 246 Mich. App. 163, 167–68 (2001).

To summarize, the prosecution was permitted to charge Petitioner with one count of felony-firearm for every felony he committed. Additionally, the Michigan Legislature intended multiple punishments for felony-firearm convictions and the other weapon crimes for which Petitioner was convicted. Defense counsel, therefore, was not ineffective

79

for failing to file a motion based on the state and federal double jeopardy clauses.

### l.  Closure of the Courtroom

Petitioner's twelfth and final claim about his trial attorney is that the attorney failed to object to the trial court's closure of the courtroom during the *voir dire* proceeding. Petitioner contends that nearly everyone knew someone involved in the case, and if his family had been allowed to remain in the courtroom, the jurors, including Amanda Hill, could have said whether they recognized and liked or disliked his family. He maintains that the alleged error violated his right to a public trial. *See* Mem. in Support of Pet. at 54–57 (ECF No. 1, PageID.75–78).

The Supreme Court has said that a violation of the right to a public trial is a structural error, which is subject to certain exceptions. *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908–09 (2017). "[W]hen a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, *Strickland* prejudice is not shown automatically." *Id.* at 1911. "Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or . . . to show that

the particular public-trial violation was so serious as to render his or her trial fundamentally unfair." *Id*. This is a heavy burden, and a habeas petitioner fails to carry his burden if most of the trial took place in an open setting, transcripts were made available from the limited session that took place, and the closure had no discernible effect on the judge, counsel, or jury. *Williams v. Burt*, 949 F.3d 966, 978 (6th Cir. 2020), *cert. denied,* 141 S. Ct. 276 (2020).

The state trial court "closed" the courtroom in Petitioner's case only during the *voir dire* proceeding because every seat was needed for the potential jurors. *See* 1/4/12 Trial Tr. at 4–5 (ECF No. 10-6, PageID.415). None of the attorneys objected, and it does not appear from a transcript of the proceeding that the "closure" had a discernable effect on the judge, counsel, or jury. In that sense, the alleged error "did not pervade the whole trial," and the temporary closure did not " 'lead to basic unfairness' in the way other structural errors have been deemed to do[.]" *Williams*, 494 F.3d at 978 (quoting *Weaver*, 137 S. Ct. at 1913). Defense counsel, therefore, was not ineffective for failing to object to the temporary closure of the courtroom to the public.

81

### m. Summary

For the reasons set forth above, Petitioner has failed to show that his trial attorney's performance was deficient and that the alleged deficiencies prejudiced his defense. Therefore, trial counsel was not constitutionally ineffective, and appellate counsel was not ineffective on direct appeal for failing to raise Petitioner's claims about trial counsel. "By definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

### 4. The Remaining Claims about Appellate Counsel

Petitioner asserts that his appellate attorney was ineffective for several other reasons. For the reasons set forth below, none have merit.

### a. Failure to Acquire Items

Petitioner first asserts that appellate counsel was ineffective for failing to retrieve a transcript of his preliminary examination, his pretrial motions, and discovery materials. *See* Mem. in Support of Pet. at 59–60 (ECF No. 1, PageID.80–81). Petitioner says that a transcript of the preliminary examination was necessary to determine whether any

82

constitutional violations, such as the denial of the right of confrontation, occurred during the preliminary examination.

The transcript of the preliminary examination was submitted as part of the state-court record in this case. It shows that defense counsel cross-examined some witnesses at the preliminary examination and was given an opportunity to cross-examine the other witnesses. *See* 4/1/11 Prelim. Examination Tr. (ECF No. 10-2). Petitioner's right of confrontation was not violated, and he merely speculates that other constitutional violations may have occurred at the preliminary examination. Thus, appellate counsel's alleged failure to acquire the transcript of the preliminary examination did not prejudice Petitioner.

Petitioner alleges next that appellate counsel should have acquired a copy of trial counsel's motion for severance, and that without the transcript, there was no way of knowing the reasons that trial counsel gave for seeking a severance. Petitioner, however, raised the severance issue in his *pro se* appellate brief, and the Michigan Court of Appeals found no merit in the claim. *See Rodea*, 2015 WL 122703, at *15. Petitioner has not shown that appellate counsel's alleged failure to obtain

83

a copy of the motion for a separate trial would have made a difference in his appeal.

Lastly, Petitioner alleges that appellate counsel should have obtained the discovery materials so that he could attach certain items to his appellate brief and show that the prosecution withheld evidence. The problem with this allegation is that Petitioner has not demonstrated that the prosecutor withheld any material evidence. So, appellate counsel's alleged failure to obtain the materials did not prejudice Petitioner's appeal.

### b. Failure to Provide Petitioner with Counsel's Brief

Petitioner alleges that his appellate attorney was ineffective for failing to provide him with the brief which counsel submitted to the Michigan Court of Appeals. Petitioner claims that this omission prevented him from knowing how counsel intended to present the sufficiency-of-the-evidence claim on appeal. *See* Mem. in Support of Pet. at 60–61 (ECF No. 1, PageID.81–82).

An attorney has a constitutional duty to consult with a defendant about an appeal when the defendant has demonstrated to counsel that

84

he is interested in appealing. *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000). Nevertheless, in *Jones v. Barnes,* 463 U.S. 745 (1983), the Supreme Court "held that appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins*, 528 U.S. 288. And when the issue is counsel's failure to raise a particular claim, it is difficult to demonstrate that counsel was incompetent. *Id.*

Petitioner apparently wanted appellate counsel to raise his sufficiency-of-the-evidence claim the way Petitioner raised the claim in this Court. He argues in his habeas petition that there was insufficient evidence to support his convictions because he lacked the specific intent needed to commit the crimes, he was merely present near the firearm, and the evidence was circumstantial and based solely on inferences and cell phone data. *See* Mem. in Support of Pet. at 15–23 (ECF No. 1, PageID.36–44).

Appellate counsel incorporated some of these concepts in his appellate brief. He also argued that there was no direct or physical

evidence that Petitioner was present during the shootings. *See* Defendant-Appellant's Brief on Appeal at 22–28 (ECF No. 10-10, PageID.794–800).

Petitioner's arguments are not clearly stronger than appellate counsel's argument that there was no evidence Petitioner was even present during the crimes. Therefore, appellate counsel's alleged failure to provide Petitioner with his appellate brief so that Petitioner could supplement the brief did not amount to constitutionally ineffective assistance.

### c. Failure to Argue the Cumulative Effect of Errors and Other Claims

Petitioner alleges that appellate counsel was ineffective for failing to raise an argument that the cumulative effect of trial counsel's errors deprived him of a fair trial. *See* Mem. in Support of Pet. at 61–62 (ECF No. 1, PageID.82–83). However, because trial counsel was not constitutionally ineffective, a claim that counsel's errors were cumulative would have lacked merit, and "[o]mitting meritless arguments is neither

professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

Petitioner also contends that appellate counsel was ineffective for failing to raise the claims that Petitioner presented on appeal. Petitioner maintains that the issues he raised on appeal were more obvious and significant than the single claim which appellate counsel raised. *See* Mem. in Support of Pet. at 62–65 (ECF No. 1, PageID.83–86). The Michigan Court of Appeals, however, rejected Petitioner's *pro se* arguments, and the additional claims about trial and appellate counsel that Petitioner raised for the first time in the Michigan Supreme Court lack merit for the reasons given in the discussion above.

"[T]he process of winnowing out weaker arguments on appeal is the hallmark of effective appellate advocacy." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751–52)). Furthermore, "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so[.]" *Richter*, 562 U.S. at 105 (internal and end citations omitted).

87

The state trial court determined on collateral review that Petitioner's claim about appellate counsel lacked merit. This ruling was objectively reasonable, because the claims that Petitioner raised on appeal are not clearly stronger than the single claim that appellate counsel raised. Given the double deference due to appellate counsel and to the state trial court's ruling on Petitioner's claim about appellate counsel, Petitioner is not entitled to relief on his claim that appellate counsel should have raised all of Petitioner's claims on appeal.

## IV.   CONCLUSION AND ORDER

For the reasons set forth above, Petitioner's prosecutorial-misconduct claim is procedurally defaulted, and his other claims either lack merit or were adjudicated in objectively reasonable decisions by the state courts.

Accordingly, **IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that the Court declines to issue a certificate of appealability because reasonable jurists could not disagree with the Court's resolution of Petitioner's claims, nor conclude that the

88

issues deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

**IT IS FURTHER ORDERED** that Petitioner may proceed *in forma pauperis* on appeal if he appeals this decision because he was granted *in forma pauperis* status in this Court, *see* ECF No. 4, and an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(3)(A).

Dated: December 14, 2022        s/Judith E. Levy
     Ann Arbor, Michigan       JUDITH E. LEVY
                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 14, 2022.

                             s/William Barkholz
                             WILLIAM BARKHOLZ
                             Case Manager